**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| MDSAVE SHARED SERVICES, INC. and MDSAVE, INC., | : : : | |
| *Plaintiff*, | : : | C.A. No. 1:22-cv-01593-RGA |
| v. | : : | |
| SESAME, INC., | : : | **JURY TRIAL DEMANDED** |
| *Defendant.* | : : | |

**FIRST AMENDED COMPLAINT**

Plaintiffs MDSave Shared Services, Inc. ("MDSave Shared Services") and MDSave, Inc., ("MDSave," and referred to collectively with MDSave Shared Services as "Plaintiffs"), by and through their counsel, hereby file this First Amended Complaint against Defendant Sesame, Inc. ("Sesame") and allege as follows:

**SUMMARY OF THE ACTION**

1.     This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, and tortious interference with prospective business relationships under the laws of the State of Delaware. Plaintiffs seek redress from Defendant's blatant ongoing infringement and tortious acts as set forth herein.

2.     MDSave Shared Services has licensed the patented technology to MDSave. MDSave built its business the old-fashioned way: with ingenuity, time, money, and hard work. Plaintiffs bring this action because the Defendant has decided to copy Plaintiff MDSave Shared Services' patented technology.

1

3.      MDSave is an online marketplace for consumers to find high-quality healthcare at affordable, upfront rates—often well below the national average.

4.      To do so, the MDSave marketplace allows patients (and proxy purchasers) to acquire bundled medical services at pre-negotiated "all-in" prices from thousands of providers across the United States. In the emerging and complicated era of high-deductible insurance plans, giving patients and their employers the ability to shop for a bundled set of services with transparency and without hidden costs is a game changer. For example, an MDSave customer can acquire a colonoscopy, including facility fee, pathology fee, anesthesia, and the procedure itself, from a high-quality provider—usually at a substantial discount from what would otherwise be available—without worrying about any additional or hidden costs or the need for insurance. MDSave also specializes in providing bundled healthcare services so that patients and employers can pay a single MDSave pre-negotiated reduced price for a multi-provider procedure such as a knee replacement, which would include the individual fees for the surgery, the anesthesia, the facility, and the physical therapy.

5.      The bundled services are represented by a purchase information record or persistent data record, hereafter called a "voucher," within a transaction information database. This model not only reduces costs but dramatically simplifies the process. In sum, MDSave's marketplace allows consumers to obtain important medical services from trusted providers across the country, including in areas under-served by high quality medical care or with large numbers of uninsured or underinsured consumers.

6.      This process was not possible without technological innovation, which is recognized in the many patents awarded to MDSave Shared Services, which are licensed to MDSave.

7.      MDSave also took nearly a decade to secure contracts with the providers and hospitals in its network.  After years of research and relationship-building, MDSave has negotiated direct contractual agreements with thousands of healthcare providers to offer bundled medical services at agreed-upon reduced rates.

8.      The list of providers and hospitals in MDSave's network, the services they provide, and the prices of those services are MDSave's proprietary data.

9.      MDSave protects that data through its website Terms & Conditions.

10.     MDSave first launched its business in 2013, and since then has experienced great growth.

11.     In 2015, MDSave raised more than $15 million from investors and expanded services to 24 states. By 2018, MDSave expanded to a network of more than 200 hospitals across 29 states. Currently, MDSave operates in 44 states, offering more than 3,000 procedures and partnering with more than 350 hospitals across the country. However, this success, and, indeed, MDSave's livelihood, is now threatened if Sesame's conduct is allowed to proceed.

12.     In or around November 2021, Plaintiffs learned that Sesame was unlawfully appropriating MDSave's business, including by using its protected data and infringing MDSave Shared Services' patents.

13.     Specifically, Plaintiffs discovered that Sesame had decided to enter MDSave's business by using data from MDSave's website in a way that violated of MDSave's Terms & Conditions and falsely representing that it had direct contractual relationships with MDSave's providers. Indeed, at that time, a review of the Sesame website demonstrated that it copied, and was exploiting, MDSave's hard-earned and protected data and know-how, such as the name and location of MDSave's healthcare partners, lists and descriptions of available bundled services and

3

procedures, MDSave's negotiated prices, and other information essential to consumers when selecting healthcare.

14.     This was abundantly clear because Sesame's website listed many of the same procedures from the same list of providers as those that were available on MDSave's website, including both imaging and non-imaging procedures.

15.     Sesame was using the proprietary pricing data MDSave generated through years of business development and market research, and had falsely represented that it had relationships with certain healthcare providers when in fact it did not.

16.     In sum, Sesame's infringement and tortious acts have caused extraordinary harm to Plaintiffs. Sesame's actions have caused Plaintiffs to lose revenues for use of its patented technology and have caused MDSave to suffer lost sales, customers, and market share; have caused extensive and damaging confusion among MDSave's customers and healthcare partners; and deprived MDSave of significant growth opportunities.

## PARTIES

17.     Plaintiff MDSave Shared Services is a corporation organized under Delaware law with its principal place of business in Brentwood, Tennessee.

18.     Plaintiff MDSave is a corporation organized under Delaware law with its principal place of business in Brentwood, Tennessee.

19.     Upon information and belief, Defendant Sesame is a corporation organized under Delaware law with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, as Plaintiffs assert claims of patent infringement arising under

federal law, and Plaintiffs' state law claim forms part of the same case or controversy as its claims arising under federal law.

21.     This Court has personal jurisdiction over Sesame because Sesame is incorporated in Delaware.

22.     Indeed, Sesame directed its website at existing and potential customers in the State of Delaware, by selling bundled healthcare services and the representative vouchers for services with healthcare providers, and, upon information and belief, engaged with existing or potential MDSave customers there by assisting in identifying healthcare providers, scheduling appointments, and otherwise facilitating customer service needs. Sesame is actively promoting its services and, upon information and belief, engaging with customers in the State of Delaware. Sesame is operating in a manner that infringes and continues to infringe MDSave Shared Services' patents, for which MDSave possesses a license, in the State of Delaware.

23.     Venue in this Court is proper under 28 U.S.C. § 1400(b), because, as set forth above, Sesame is incorporated in Delaware, and thus resides in the State of Delaware, and is subject to this Court's personal jurisdiction in this District. Indeed, Sesame has used MDSave's protected data a way that violated MDSave's Terms & Conditions and exploited it and sold it through Sesame's website offering bundled healthcare services from healthcare providers in this District, as Sesame offers bundled healthcare services from healthcare providers in this District. Sesame has infringed MDSave Shared Services' patents.

## FACTUAL ALLEGATIONS

### Plaintiffs' Technological Innovations

24.     MDSave provides an online healthcare marketplace that allows individuals and employers to purchase bundled healthcare services and their respective vouchers for common medical procedures, such as MRIs, CT scans, ultrasounds, colonoscopies, blood tests, and general

surgeries, at upfront and reduced rates, which it has negotiated in advance with a nationwide network of healthcare partners. MDSave's negotiated rates are often far below the national average, offering patients savings up to 60%, a feat it has achieved by building meaningful relationships with its healthcare partners who are pleased to provide their services to a growing patient base.

25.     MDSave also sells bundles of its vouchers to employers through its proprietary employer platform, MDSave for Employers, which grants employers access to a private network of local hospitals and providers. For example, an employer may select to purchase a group of common services, such as for MRIs, mammograms, colonoscopies, blood tests, CT scans, and ultrasounds, which the employer offers as a supplement or substitute to a sponsored health plan.

26.     Forming relationships with its healthcare partners requires significant work. MDSave performs extensive research into potential healthcare partners, from single-office providers to large regional hospital groups. It often takes months to reach a final agreement. And after an agreement is reached, MDSave's technology team then performs extensive work with its healthcare partners, including by assisting the partners with integration and implementation. MDSave's account management teams also work closely with the healthcare partners to educate them on MDSave's platform and services, which involves onsite visits at the hospitals and providers to train all facility staff on how to accept and process an MDSave voucher. Finally, MDSave also meets with the healthcare partner's physicians, radiologists, pathologists, anesthesiologists, and all other providers, to negotiate rates for vouchers and bundles of vouchers. This allows MDSave to offer comprehensive voucher bundles to employers at affordable prices.

27.     Since its founding in 2011, MDSave has built partnerships with 7 out of the 10 largest healthcare systems in the country, including 350 hospitals and more than 6,000 individual

providers, which collectively offer more than 3,000 individual procedures. To accomplish this, MDSave has expended more than $30 million and countless hours conducting market research, traveling to meet with and develop relationships with existing and potential healthcare partners, and, ultimately, negotiating reduced-fee rates for essential bundled healthcare procedures that it can offer to its existing and potential customers.

28.     MDSave has also achieved this growth by developing and expanding its customer base, which it does by building and developing its online tools, including its website and protected data, and engaging with new and existing customers, through customer service, advertising, and other outreach efforts.

29.     MDSave's innovative online marketplace has been recognized across the industry. In 2013, MDSave was awarded Top Healthcare Startup by the Nashville Area Chamber of Commerce. In 2015, Fortune featured MDSave in an article describing it as "the healthcare version of Expedia" that "plans to save lives, lower medical bills." In 2019, MDSave was recognized as #152 on Inc. Magazine's list of the 5,000 fastest-growing companies in the nation. MDSave has been featured in other national publications and media including Consumer Reports, Fox News, Bloomberg Business, and Yahoo! Finance. MDSave's platform is enabled by MDSave Shared Services' patented technology.

30.     MDSave's success in the marketplace is based on the technological innovations described in the patents described below and currently being infringed by Sesame.

**Defendant Sesame**

31.     In or around November 2021, Plaintiffs discovered that Sesame was offering virtually the same list of procedures from the same list of providers as those available on MDSave's website.

32.     The list of providers and hospitals in MDSave's network, the procedures they provide, and the prices of those services are MDSave's proprietary data.

33.     MDSave protects that data through, at least, its website Terms & Conditions.

34.     MDSave's Terms & Conditions can be found at https://www.mdsave.com/termsandconditions.

35.     Article 5.2 of MDSave's Terms & Conditions states in part, and has stated at all relevant times:  "5.2. Prohibited Activities.  You shall not: (a) make the Services available to anyone other than Users; (b) sell, resell, rent or lease the Services; (c) use the Services to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy rights; (d) use the Services for any malicious purpose; (e) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein; (f) build a product or service that is competitive to the Services or use the Services in a way that competes with us; or (g) attempt to gain unauthorized access to the Services or their related systems or networks."

36.     Article 5.3 of MDSave's Terms & Conditions states in part, and has stated at all relevant times: "5.3. Examples of Prohibited Activities. By way of example, and not as a limitation, you agree that you will not take any of the following actions while using or accessing the Site or Services: . . . 5.3.5. copy, reproduce, republish, upload, post, transmit, or distribute the Services, the Site, or any content thereof; 5.3.6. share or sell information derived from or related to the Services, the Site, or any content thereof; 5.3.7. modify, translate, alter, adapt, decompile, disassemble (except to the extent applicable laws specifically prohibit such restriction), reproduce, distribute, or display, or create derivative works, compilations, or collective works based on the Services, the Site, or any content thereof; [or] . . . 5.3.19. access, copy, store, reproduce, display,

8

transfer, extract, or harvest Site content or Site data through scraping, crawling, spidering, botting, or other similar means, whether manually or through an automated system or software, whether such Site content or Site data is displayed directly from the Site, Services, or through an Approved Developer's application, service, website, or otherwise directly or indirectly through a third party . . . ."

37.    Sesame, itself, recognizes the importance of protecting the proprietary data on its website through its own Terms of Service.

38.    Sesame's Terms of Service can be found at https://sesamecare.com/terms-of-service.

39.    Article 3 of Sesame's Terms of Service states in part:  "You agree to use the Services only to help you find a health care provider for yourself or another person. . . . Unless otherwise expressly authorized herein or in the Service, you agree not to display, distribute, license, perform, publish, reproduce, duplicate, copy, create derivative works from, modify, sell, resell, exploit, transfer or upload for any commercial purposes, any portion of the Service, use of the Service, or access to the Service. The Service is for your personal use only."

40.    Article 6 of Sesame's Terms of Service states in part:  "Except as expressly authorized by Sesame, you agree not to modify, copy, frame, scrape, rent, lease, loan, sell, distribute or create derivative works based on the Service or the Service Content, in whole or in part, except that the foregoing does not apply to your own User Content (as defined below) that you legally upload to the Service. In connection with your use of the Service you will not engage in or use any data mining, robots, scraping or similar data gathering or extraction methods."

41.    The "Services" are defined in Sesame's Terms and Conditions as Sesame's "services (described below) to you ("you") through its website located at www.sesamecare.com

(the "Site") and through its mobile applications (the "App"), and through its related services, content, tools, widgets, software, API(s), and/or other product(s), service(s), data, or information supplied to you by Sesame."

42.    Upon information and belief, Sesame's offered prices were derived from MDSave's own negotiated prices with those same vendors, except that they were significantly marked up. Thus, Sesame was improperly pursuing its own ends by marking up a service that it did not provide and was not authorized to sell. This harmed not only MDSave, but also the purchaser, the provider, and the overall goal of delivering affordable healthcare.

43.    Sesame used MDSave's data to infringe MDSave Shared Services' patents and unfairly compete with MDSave in the same markets, for the same services, from the same healthcare providers, and for the same potential customers.

44.    Sesame based its own vouchers off of using MDSave's data in a way that violated MDSave's Terms & Conditions, adding a consistent mark-up, such as $100, and then used MDSave's data again to negotiate its own vouchers with new customers.

45.    Sesame claimed that it had a provider network of "10,000 doctors and specialists" that had agreed to "participate" on its platform. Sesame also represented that for each provider listed on its website, Sesame had already vetted the provider by having the provider "share" the provider's "licensure, education, and clean disciplinary history." *See* https://sesamecare.com/faq. For instance, its website stated:

**How does Sesame vet providers?**                                                                —

The quality of our partners is a priority. Sesame works with licensed providers, who share their licensure, education history, and confirm a clean disciplinary history as a condition for participating on the platform. Consumers can fully evaluate their options to help ensure the provider is a good fit for them. However, the inclusion of any provider on the Services shall not be considered as an endorsement of such health care provider by Sesame. You should conduct your own due diligence concerning the qualifications of a health care provider prior to paying for or receiving care.

46.     But most, if it not all, of the healthcare partners Sesame claimed to have were, in fact, at one point derived from MDSave's website. Sesame simply did not have the relationships it represented it did.

47.     Upon information and belief, Sesame did not require that providers listed on the site "share" the provider's "licensure, education, and clean disciplinary history as a condition for participating on the platform."

48.     These were providers with whom MDSave first developed relationships. Upon information and belief, Sesame only listed these partners because it used MDSave's data in a way that violated MDSave's Terms & Conditions and in a manner that infringed MDSave Shared Services' patents.

49.     Indeed, upon information and belief, when a Sesame customer would choose to buy a service from such a provider, Sesame would then reach out to that provider and attempt to negotiate a transaction price with them, using the MDSave information to negotiate.

50.     In addition, or alternatively, Sesame might have obtained an MDSave voucher from a third party to resell. Of course, Sesame both obtained the "sale" of the voucher and attempted to negotiate a rate with the healthcare provider wrongfully using MDSave's data, or outright reselling MDSave vouchers without Sesame having authorization to do so from MDSave.

51.     Sesame has recently stated that it ceased "anonymized listings" in May 2022 and only lists appointments with contracted providers but, despite this statement, Sesame continues to advertise and sell its "anonymized listings," as shown in the below screenshots. And even if true, Sesame continues to infringe Plaintiffs' patents, as discussed below.



**The '072 Patent**

52.     MDSave Shared Services owns United States Patent No. 9,123,072 (the "'072 Patent"), attached hereto as **Exhibit 2**.

53.     The '072 Patent and its claims are directed to a technological solution, including a specific architecture, used to facilitate procurement of healthcare services.

54.     For example, the Abstract of the '072 Patent states:

An apparatus for facilitating purchases of services includes an application server providing a network service and maintaining a service offer database that comprises a plurality of service offer information records respectively associated with a plurality of service offers. The plurality of service offers include at least one service offer for a bundled set of services. Each information record comprises an indication of a primary service, a purchase price, a payment amount for a primary service, and compensation information for receiving payment for the primary service. Upon being accessed by user operating a client system, the network service is operable to receive an indication of a service offer being selected for purchase by the user, receive purchase information from the user specifying a funding source, and issue a request to the funding source for funds corresponding to the purchase price included in the information record associated with the selected service offer.

55.    The '072 Patent identifies the need for a technological solution – specifically "the need for a mechanism" – that creates and enables a computer system to offer the medical services as described and claimed in the '072 Patent. *See* '072 Patent at 1:41-60.

56.    With this in mind, the '072 Patent teaches computing systems, architectures, and methods to solve the problem, as identified in the following paragraphs.

57.    The '072 Patent teaches an application server that provides "a network services that is accessible to a plurality of users through a plurality of client systems." '072 Patent at 1:64-2:2.

58.    The '072 Patent further teaches that the plurality of client systems are "communicatively coupled to the application server via a network and a data storage system." '072 Patent at 2:1-4.

59.    The '072 Patent teaches that the service offer database is maintained in a data storage system, '072 Patent 10:25-40, and the service offer database comprises service offer information records. '072 Patent at 14:38-15:8.

60.    The '072 Patent teaches that a client system accesses the network service, which then indicates a selected service and funding source. '072 Patent at 2:7-24.

61.     The '072 Patent teaches that a request is issued to the identified funding source that specifically correspond to the information record associated with a selected service offer. '072 Patent at 2:7-24.

62.     The '072 Patent teaches that a purchase information record for a specific purchase comprises a unique confirmation number for the purchase, along with indications of the corresponding healthcare service providers, and whether the purchased has been redeemed. '072 Patent at 4:12-22.

63.     The '072 Patent teaches storing the purchase information record with a transaction information database and that this transaction information database is maintained within the data storage system. '072 Patent at 3:64-4:11.

64.     The '072 Patent teaches transmitting a set of voucher information to the client system that is generated based on the respective purchase information record for the processed purchase for rendering a voucher for the specific user within a user interface that is implemented at the client system that specifies the unique confirmation number. '072 Patent at 4:12-22.

65.     The '072 Patent teaches that the network services operates to access a servicer for a financial account indicated by the compensation information, whereby the associated disbursement of funds is directed to the primary healthcare service. '072 Patent at 2:35-43.

66.     The '072 Patent teaches that the network service operates to access a servicer for a financial account indicated by the compensation information, whereby the associated disbursement of funds is directed to the secondary healthcare service. '072 Patent at 2:44-61.

67.     The '072 Patent teaches the application server implementing a web application to provide the network service where each client system implements a client application that provides

a web-based user interface to access the network service provided by the application via the web application. '072 Patent at 2:25-34.

68.     The asserted claims of the '072 Patent recite and incorporate the improvements discussed above in specific, discrete implementations.

69.     For example, Claims 1, 13, and 25 specifically incorporate the teaching discussed in ¶¶ 57-64 above. Claims 2, 14, and 26 incorporate those teaching along with that in ¶ 65. Claims 3, 4, 16, and 26 specifically incorporate incorporates the teaching discussed in ¶ 66. Claims 12 and 14 specifically incorporate the teachings discussed in ¶ 67.

70.     The teachings of the '072 Patent, especially as incorporated into the claims, represent technological solutions and combinations that were not available at the time of priority, as discussed by Michael T. Goodrich, Ph.D. in his declaration attached as **Exhibit 1**, which is incorporated by reference.

71.     Merely to provide examples, Dr. Goodrich opines:

(i)     The '072 is directed to an apparatus for facilitating purchases of services that includes an application server providing a network service and maintaining a service offer database that comprises a plurality of service offer information records respectively associated with a plurality of service offers. The plurality of service offers include at least one service offer for a bundled set of services. Each information record comprises an indication of a primary service, a purchase price, a payment amount for a primary service, and compensation information for receiving payment for the primary service. Goodrich Decl. at ¶ 13.

(ii)     Notably, however, the '072 Patent teaches further details to aid in the solution described below, which are then incorporated into certain dependent claims. Further, claim 1 provides structure for how to solve the problem, including, for example, "the service offer database comprising a plurality of service offer information records respectively associated with a plurality of service offers, the plurality of service offers including at least one service offer for a bundled set of healthcare services, each service offer information record comprising an indication of a primary healthcare service of the associated service offer, a purchase price for the associated service offer, an indication of a corresponding healthcare service provider for the primary healthcare service, a payment amount for the primary healthcare service, and compensation information for the primary healthcare service" and "transmit a set of voucher information to the client system generated based on the respective purchase information record for the processed purchase for rendering a voucher for the user within a user interface implemented at the client system that specifies the unique confirmation number for the purchase, the corresponding

healthcare service provider for the primary healthcare service for the purchased service offer, and the corresponding healthcare service provider for each of any secondary healthcare service of the purchased service offer." Goodrich Decl. at ¶ 29.

(iii)     For example, the '072 Patent teaches the application server implementing a web application to provide the network service where each client system implements a client application that provides a web-based user interface to access the network service provided by the application via the web application. As made clear by this teaching, this is a solution related to how the application server functions with the overall goal of solving the need discussed above. This specific teaching is incorporated into claims 12 and 24 of the '072 Patent. Goodrich Decl. at ¶ 30.

(iv)     In short, the '072 Patent and claims are directed to specific technological solutions that are rooted in computer technology, and these solutions are claimed specifically to overcome the problems the '072 Patent identifies which, again, and as I describe above, are problems in the realm of computer technology. Contrary to an abstract idea that simply involves collecting information, analyzing it, and displaying it, or a mathematical analysis that could be done with paper and pencil, the '072 claim 1 recites the generation of new data, including "generate a respective purchase information record for the purchase that comprises a unique confirmation number for the purchase, an indication of the corresponding healthcare service provider for the primary healthcare service for the purchased service offer, an indication of a corresponding healthcare service provider for each of any secondary healthcare service of the purchased service offer, and an indication of whether, for each of the primary healthcare service and any secondary healthcare service of the purchased service offer, the purchase has been redeemed with respect to the healthcare service that is initially set to indicate that the purchase has not been redeemed with respect to the healthcare service." Goodrich Decl. at ¶ 33.

72.     The asserted claims of the '072 Patent do not preempt every solution – or even many solutions – for facilitating purchases healthcare services. Instead, the asserted claims are very narrow to claim the specific improvements in computer technology – the technology that improved this computer process.

73.     The '072 Patent's asserted claims, as laid out above, do not simply instruct someone to apply an idea on a computer. The arrangement of the claim elements is not conventional.

74.     The inventions claimed by the '072 Patent represent a significant advance over the prior art.

75.     The examiner recognized during prosecution of the '072 Patent that the prior art of record "alone or in combination, neither anticipates, reasonably teaches, nor renders obvious" the

claimed feature that "each service offer information record comprising an indication of a primary healthcare service of the associated service offer, a purchase price for the associated service offer, an indication of a corresponding healthcare service provider for the primary healthcare service, a payment amount for the primary healthcare service, and compensation for the primary healthcare service." Feb. 11, 2015 Office Action, at 5.

76.    The examiner rejected the initially proposed claims under 35 U.S.C. § 101.

77.    However, after the claims were amended to include additional limitations from certain dependent claims, the examiner withdrew the Section 101 rejection and allowed the claims. Mar. 25, 2015 Notice of Allowance, at 2-3.

78.    The examiner withdrawing the Section 101 rejection and allowing the claims illustrates that the issued claims are directed to a specific implementation of a solution to a problem in the computing arts rather than an abstract idea that would raise preemption concerns. Mar. 25, 2015 Notice of Allowance, at 2-3.

79.    Moreover, the claims of the '072 Patent do not merely use well-understood, routine, or conventional techniques or systems.

80.    The claimed combinations also improve the operation of computer functionality, enabling the elements of the system to address the problems recognized in prior art systems as discussed in the Background of the Invention and the Summary of the Invention.

81.    The inventions claimed in the '072 Patent are not claiming a business method but, instead, claim a technical way to satisfy an existing problem for facilitating online purchases through certain network architectures.

82.    Each claim of the '072 Patent represents a separate invention, which is presumed to be valid under 35 U.S.C. §282.

83.     The claims of the '072 Patent are also presumed to be patent eligible under 35 U.S.C. §101.

84.     At all relevant times, MDSave has possessed and currently possesses a full and complete license to the '072 Patent from MDSave Shared Services.

### Defendant's Infringement of the '072 Patent

85.     As shown in the '072 Patent preliminary claim charts, which are attached hereto as **Exhibit 3**, Sesame is infringing at least claims 1-4, 12-16, 24-26 of the '072 Patent through its products and services in the United States.

86.     For example, as the claim chart shows, Sesame is selling bundled healthcare services through a networked application server, using a database comprising of a plurality of procedure, provider, and price data and generating its own purchase information records (or "vouchers"). *See* **Exhibit 3**. Sesame, upon information and belief, is also maintaining records of purchases and redemptions on a transactional information database as part of its data storage systems. *See Id*.

87.     Through this First Amended Complaint, MDSave Shared Services alleges direct infringement of the '072 Patent in violation of 35 U.S.C. § 271 against Sesame, as set forth below in the First Claim for Relief.

### The '423 Patent

88.     MDSave Shared Services owns United States Patent No. 11,170,423 B2 (the "'423 Patent"), attached hereto as **Exhibit 4**.

89.     The '423 Patent and its claims are directed to a technological solution, including a specific architecture, used to facilitate procurement of healthcare services triggered by a lifecycle event.

90.     For example, the Abstract of the '423 Patent states:

> Apparatus and associated methods related to determining medical services appropriate to a patient in response to a patient lifecycle event: presenting the medical services to the patient for selection; optionally scheduling the selected medical services; and automatically presenting the selected services for prepayment. The patient lifecycle event may be, for example, a doctor's order, diagnosis, condition change, payment, admission, or discharge. The services presented to the patient may be determined in response to, and as a function of, the lifecycle event. For example, the services presented may include procedures determined after the lifecycle event, in view of patient medical history. In an illustrative example, the services presented may be based on medical indication, contraindication, provider or facility availability, or patient scheduling preference, advantageously permitting more medically relevant, beneficial, convenient, or cost-effective services. Various examples may advantageously provide a discount for a service bundle provided at a particular time or facility or by an affiliated physician or medical group.

91.     The '423 Patent identifies a need for a technological solution – specifically a technical solution where an improved computer system and method determines medical services appropriate to a patient in response to a patient lifecycle event. '423 Patent at 2:35-46.

92.     With this in mind, the '423 Patent teaches an improved technological solution whereby computing systems, architectures, functions, and methods solve the problem described by the patent, as identified in the following paragraphs.

93.     The '423 Patent teaches a computer processor receiving an electronic message that comprises an "electronic health record" (or, "EHR") where updated patient medical data is encoded. '423 Patent at 54:47-55:33.

94.     The '423 Patent teaches a computer processor determining the current patient lifecycle state based on the EHR. '423 Patent at 55:10-34.

95.     The '423 Patent teaches a computer processor determining whether a patient lifecycle event occurred based on the processor comparing a historical lifecycle state with the current patient lifecycle state. '423 Patent at 55-34-43.

96.     The '423 patent teaches, in response to the determination by the processor that a patient lifecycle event occurred, (a) the processor determining medical services to be offered to

19

the patient where the services are not contraindicated by based on, for example, the processor determining such from the patient medical history, '423 Patent at 2:66-3:3, (b) the processor in a user interface presenting the medical services to be offered to the patient where this is a function of available service location and available service time, '423 Patent at 4:20-49, and (c) the processor in a user interface automatically presenting the selected services to the patient for prepayment. '423 Patent at 4:20-49.

97.     The '423 Patent teaches the processor scheduling the selected medical services based on the processor associating an available service location and an available service time with a patient selected service location and a selected service time. '423 Patent at 4:20-49.

98.      The '423 Patent further teaches the processor sending the selected medical services to a hospital to be scheduled by the hospital based specifically on associating an available service location and an available service time with a patient selected service location and service time. '423 Patent at 3:34-63.

99.     The '423 Patent teaches where the medical services appropriate to the patient are determined as a function of the patient lifecycle event, where the lifecycle event may be a patient service scheduled or a doctor's order issued. '423 patent at 4:3-13.

100.     The '423 Patent further teaches the processor offering the patient a discount for prepayment. '423 Patent at 4:5-19.

101.     The asserted claims of the '423 Patent recite and incorporate the improvements discussed above in specific, discrete implementations.

102.     For example, Claim 1 specifically incorporates the teaching discussed in ¶¶ 92-96. Claim 2 specifically incorporates the teaching discussed in ¶ 97. Claim 3 specifically incorporates the teaching in ¶ 98, and claims 4-6 specifically incorporate the teaching in ¶ 99.

103.    The teachings of the '423 Patent, especially as incorporated into the claims, represent technological solutions and combinations that were not available at the time of priority, as discussed by Michael T. Goodrich, Ph.D. in his declaration attached as **Exhibit 1**, which is incorporated by reference.

104.    Merely to provide examples, Dr. Goodrich opines:

(i)    These claims recite specific steps and functions to implement the technological advancement taught in the patent specification. For example, claim 1 recites "determining, by the processor, medical services to be offered to the patient, wherein the medical services are not contraindicated for the patient based on the lifecycle event and the patient medical history determined by the processor as a function of the EHR; presenting, by the processor in a user interface, the medical services to be offered to the patient for selection as a function of available service location and available service time; and automatically presenting, by the processor in the user interface, the selected services to the patient for prepayment." Goodrich Decl. at ¶ 50.

(ii)    In short, the '423 Patent and its claims are directed to specific technological solutions that are rooted in computer technology, and these solutions are claimed specifically to overcome the problems the '423 Patent identifies which, again, and as I describe above, are problems in the realm of computer technology.  Contrary to an abstract idea that simply involves collecting information, analyzing it, and displaying it, or a mathematical analysis that could be done with paper and pencil, the '072 claim 1 recites the generation of new data, including "determining, by the processor, medical services to be offered to the patient." Goodrich Decl. at ¶ 53.

(iii)    In addition, in my opinion, the elements of the above-discussed claims are combined so as to claim an inventive concept. For example, claim 1 recites a specific combination of steps that, on my experience in the field, was not routine and conventional as of the priority date of the '423 Patent. For instance, combining the electronic message, which incorporates an EHR where the patient data is encoded, was part of solving the problem identified by the '423 Patent regarding prior art systems that have the aforementioned deficiencies. My understanding is that the USPTO examiner also noted similar findings. Goodrich Decl. at ¶ 56.

105.    The asserted claims of the '423 Patent do not preempt every solution – or even many solutions – for determining medical services appropriate to a patient in response to a patient lifecycle event. Instead, the asserted claims of the '423 Patent are very narrow to claim the specific improvements in computer technology – specifically the technology that improved this computer process.

106.    The '423 Patent's asserted claims, as laid out above, do not simply instruct someone to apply an idea on a computer. The arrangement of the claim elements is not conventional.

107.    The inventions claimed by the '423 Patent represent a significant advance over the prior art.

108.    During prosecution of the '423 Patent, certain initially pending claims were rejected by the examiner under 35 U.S.C. § 101. Those claims were canceled, leaving only claims that the examiner did not view as subject to a § 101 rejection. The remaining claims were allowed following the filing of a terminal disclaimer, illustrating that the issued claims are directed to a specific implementation of a solution to a problem in the computing arts rather than an abstract idea that would raise preemption concerns.

109.    Moreover, the claims of the '423 Patent do not merely use well-understood, routine, or conventional techniques or systems. The claimed combinations also improve the operation of computer functionality, enabling the elements of the system to address the problems recognized in prior art systems as discussed in the Background of the Invention and the Summary of the Invention.

110.    The inventions claimed in the '423 Patent are not claiming a business method but, instead, claim a technical way to satisfy an existing problem as described by the '423 Patent through certain specific arrangements of features and functions that improve a technological process.

111.    Each claim of the '423 Patent represents a separate invention, which is presumed to be valid under 35 U.S.C. §282.

112.    The claims of the '423 Patent are also presumed to be patent eligible under 35 U.S.C. §101.

113.    At all relevant times, MDSave has possessed and currently possesses a full and complete license to the '423 Patent from MDSave Shared Services.

### Defendant's Infringement of the '423 Patent

114.    As shown in the '423 Patent preliminary claim charts, which are attached hereto as **Exhibit 5**, Sesame is infringing at least Claims 1-6, 9 of the '423 Patent through its products and services in the United States.

115.    Through this First Amended Complaint, MDSave Shared Services alleges direct infringement of the '423 Patent in violation of 35 U.S.C. § 271 against Sesame, as set forth below in the Second Claim for Relief.

### The '115 Patent

116.     MDSave Shared Services owns United States Patent No. 11,367,115 (the "'115 Patent"), attached hereto as **Exhibit 6**.

117.    The '115 Patent and its claims are directed to a technological solution, including a specific architecture and functionality, related to prepaid bundled healthcare services with virtual payment distribution.

118.    For example, the Abstract of the '115 Patent states:

> Apparatus and associated methods relate to presenting for selection, services comprising at least one bundled set of healthcare services to be performed separately by respective providers, determining a bundle price for the at least one bundled set of healthcare services and in response to receiving payment in an amount of the bundle price, generating a persistent purchase data record with a unique confirmation number that is selectively redeemable by the user to receive each of the healthcare services in the bundled set. The bundle price may be discounted and/or based on the location or time at which at least one service will be performed. The bundle price may also be based on the user's remaining health insurance deductible. A single payment may be disbursed to multiple providers of the bundled set of healthcare services. The received and/or disbursed payment may be in virtual funds.

119.    The '115 Patent identifies the need for a technological solution – specifically techniques for presenting to users a selection of at least one bundled set of healthcare services with virtual payment distribution.

120.    With this in mind, the '115 Patent teaches computing systems, architectures, and methods to solve the problem, as identified in the following paragraphs.

121.    The '115 Patent teaches using a processor to receive an electronic message where that electronic message can be encrypted. '115 Patent at 43:52-67.

122.    The '115 Patent teaches that in response to receiving the electronic message that comprises the user payment, the processor is utilized to generate an electronic health record that comprises a purchase data record that is identified by and with a unique confirmation number. '115 Patent at 56:28-47.

123.    The '115 Patent teaches that the processor presents an initial individual redemption status in the purchase data record for each selectively redeemable healthcare service as purchased and unredeemed. '115 Patent at 24:54-25:6.

124.    The '115 Patent teaches utilizing the processor to provide access to the purchase data record to receive each selectively redeemable healthcare service of the plurality of services. '115 Patent at 4:40-53.

125.    The '115 Patent teaches that in response to receiving the electronic message, storing the electronic health record in a memory specifically configured to be operably coupled with the processor, '115 Patent at 56:48-67, where the processor sends the electronic health record to at least one provider, where the electronic health record may encode patient data. '115 Patent at 49:54-50:23, 56:12-23.

126.    The '115 Patent further teaches that the memory is operably coupled to the processor and where memory comprises encoded processor executable instructions and data, where the instructions and data jointly program and configure the processor and where the instructions when executed by the processor cause the processor to perform operations. '115 Patent at 55:30-45.

127.    The '115 Patent teaches the processor sending the unique confirmation number to the user. '115 Patent at 56:28-42.

128.    The '115 Patent that payment of the healthcare bundle may be received in virtual funds. '115 Patent at 5:4-12.

129.    The '115 Patent teaches that the processor determines the amount of the received payment applied to a health insurance deductible. '115 Patent at 55:66-56:9.

130.    The '115 Patent teaches that the purchase data record persist in a data store that is operably coupled with the processor and where the purchase data record is redeemable using the processor until each of the plurality of healthcare services in the bundled set is redeemed. '115 Patent at 56:3-23.

131.    The '115 Patent teaches the processor updating the redemption status of the purchase data to indicate redemption of at least one of the plurality of healthcare services. '115 Patent at 4:40-53.

132.    The asserted claims of the '115 Patent recite and incorporate the improvements discussed above in specific, discrete implementations.

133.    For example, Claim 1 specifically incorporates the teaching discussed in ¶¶ 120-124. Claim 2 specifically incorporates the teaching discussed in ¶ 125.

134.     Claim 3 specifically incorporates the teaching discussed in ¶ 126. Claim 4 specifically incorporates the teaching discussed in ¶ 127. Claim 5 specifically incorporates the teaching discussed in ¶ 128. Claim 15 specifically incorporates the teaching discussed in ¶ 129. Claim 17 specifically incorporates the teaching in ¶ 130, and claim 25 specifically incorporates the teaching in ¶ 131.

135.     The teachings of the '115 Patent, especially as incorporated into the claims, represent technological solutions and combinations that were not available at the time of priority, as discussed by Michael T. Goodrich, Ph.D. in his declaration attached as **Exhibit 1**, which is incorporated by reference.

136.     Merely to provide examples, Dr. Goodrich opines:

(i)     These claims recite specific steps and functions to implement the technological advancement taught in the patent specification. For example, claim 1 recites "receiving, an electronic message comprising a user payment for a bundled set of a plurality of selectively redeemable healthcare services to be provided by a plurality of respective providers, using a processor, wherein the received payment is pre-paid in an amount of a bundle price based on a location at which at least one selectively redeemable healthcare service of the bundled set of healthcare services will be provided." Goodrich Decl. at ¶ 72.

(ii)     In short, the '115 Patent and in particular claims discussed in this opinion are directed to specific technological solutions that are rooted in computer technology, and these solutions are claimed specifically to overcome the problems the '115 Patent identifies which, again, and as I describe above, are problems in the realm of computer technology. Contrary to an abstract idea that simply involves collecting information, analyzing it, and displaying it, or a mathematical analysis that could be done with paper and pencil, claim 1 recites the generation of new data, including "generating, an electronic health record comprising a purchase data record identified by and with a unique confirmation number using the processor." Goodrich Decl. at ¶ 75.

(iii)     In addition, in my opinion, the elements of the above-discussed claims are combined so as to claim an inventive concept. For example, the claims recite a specific combination of steps that, on my experience in the field, was not routine and conventional as of the priority date of the '115 Patent. For instance, combining the functioning of an EHR with the usage of the claimed and taught electronic message contributed to the solution of the problem identified by the '115 Patent regarding prior art systems that have the aforementioned deficiencies. Goodrich Decl. at ¶ 78.

137.    The asserted claims of the '115 Patent do not preempt every solution – or even many solutions – for an improved virtual payment system. Instead, the asserted claims are very narrow to claim the specific improvements in computer technology – the technology that improved this computer process.

138.    The '115 Patent's asserted claims, as laid out above, do not simply instruct someone to apply an idea on a computer. The arrangement of the claim elements is not conventional.

139.    The inventions claimed by the '115 Patent represent a significant advance over the prior art.

140.    The examiner initially rejected claims of the '115 Patent as being anticipated and being unpatentable under 35 U.S.C. §101. During prosecution of the '115 Patent, however, the '115 Patent application was amended and overcame both the Section 101 and 102 rejections and received a notice of allowance on May 10, 2022.

141.    While the examiner rejected the initially proposed claims under 35 U.S.C. § 101, the examiner noted the following after amendment to the claims: "The Applicant amended the claims to include: presetting, an initial individual redemption status in the purchase data record for each selectively redeemable healthcare service of the at least one bundled set of healthcare services as purchased and unredeemed using the processor, and providing, a user access to the purchase data record to receive each selectively redeemable healthcare service of the plurality of healthcare services, using the processor. The Applicant also amended the claims to include the electronic record and electronic message. Therefore the 101 and prior art rejections have been withdrawn."

142.    Moreover, the claims of the '115 Patent do not merely use well-understood, routine, or conventional techniques or systems.

143.     The claimed combinations also improve the operation of computer functionality, enabling the elements of the system to address the problems recognized in prior art systems as discussed in the Background of the Invention and the Summary of the Invention.

144.     The inventions claimed in the '115 Patent are not claiming a business method but, instead, claim a technical way to satisfy an existing technological problem for virtual payments related to bundled healthcare services.

145.     Each claim of the '115 Patent represents a separate invention, which is presumed to be valid under 35 U.S.C. §282.

146.     The claims of the '115 Patent are also presumed to be patent eligible under 35 U.S.C. §101.

147.     At all relevant times, MDSave has possessed and currently possesses a full and complete license to the '115 Patent from MDSave Shared Services.

**Defendant's Infringement of the '115 Patent**

148.     As shown in the '115 Patent preliminary claim charts, which are attached hereto as **Exhibit 7**, Sesame is infringing at least Claims 1-5, 9-11, 13-15, 17, 25, 27, and 28 of the '115 Patent through its products and services in the United States.

149.     Through this First Amended Complaint, MDSave Shared Services alleges direct infringement of the '115 Patent in violation of 35 U.S.C. § 271 against Sesame, as set forth below in the Third Claim for Relief.

**The '160 Patent**

150.    MDSave Shared Services owns United States Patent No. 11,315,160 (the "'160 Patent"), attached hereto as **Exhibit 8**.

151.    The '160 Patent and its claims are directed to a technological solution, including a specific architecture and functionality, related to prepaid bundled healthcare services with virtual payment distribution.

152.    For example, the Abstract of the '160 Patent states:

> Apparatus and associated methods relate to presenting for selection services comprising at least one bundled set of healthcare services to be performed separately by respective providers, determining a bundle price for the at least one bundled set of healthcare services, and in response to receiving payment in an amount of the bundle price, generating a persistent purchase data record selectively redeemable to receive each of the at least one bundled set of healthcare services, and assigning a unique confirmation number generated for the purchase data record. The received payment may be a virtual funds payment. The bundle price may be discounted. The bundle price may be based on the location or time at which at least one service will be performed. The bundle price may be based on the user's remaining health insurance deductible. Payment may be disbursed to multiple providers of the bundled set of healthcare services. Disbursed payment may be virtual funds.

153.    The '160 Patent identifies the need for a technological solution – specifically an apparatus capable for generating bundled healthcare services as described in the patent and below.

154.    With this in mind, the '160 Patent teaches computing apparatuses and architectures, to solve the problem, as identified in the following paragraphs.

155.    The '160 Patent teaches an apparatus that with a processor and user interface, where the user interface is operably coupled with the processor. '160 Patent at 55:30-45.

156.    The '160 Patent further teaches a memory being operably coupled to the processor where the memory is capable of encoding processor executable program instructions and data to

program and configure the processor to cause the apparatus to perform certain operations, described below. '160 Patent at 55:30-45.

157.   The '160 Patent teaches the aforementioned operations to be capable of including receiving an electronic message that comprises, in part, a user payment for a bundled set of a plurality of selectively redeemable healthcare services. '160 Patent at 55:30-45.

158.   The '160 Patent teaches that, in response to receiving the electronic message, the capability of generating an electronic health record (EHR) that comprises a purchase data record identified by and with a unique confirmation number. '160 Patent at 56:28-42.

159.   The '160 Patent teaches the capability of presetting an initial individual redemption status in the purchase data records and providing user access to the purchase data record. '160 Patent at 24:54-25:6.

160.   The '160 Patent further teaches the apparatus where the processor, in response to receiving the electronic message comprising the user payment, is capable of storing the health record in the memory and sending the health record to at least one provider. '160 Patent at 24:54-25:6, 56:28-42.

161.   The '160 Patent teaches the processor capable of performing the operation to send the unique confirmation to the user. '160 Patent at 56:28-42.

162.   The '160 Patent teaches that the received payment received may comprise virtual funds. '160 Patent at 56:6-27.

163.   The '160 Patent teaches a processor that is capable of determining the amount of the received payment applied to the health insurance deductible as a function of the health insurance policy. '160 Patent at 56:3-8.

164.    The '160 Patent teaches that the purchase data record is capable of persisting in a data store that is operably coupled with the processor and where the purchase data record is redeemable until each of the plurality of healthcare services in the bundled set is redeemed. '160 Patent at 56:9-13.

165.    The asserted claims of the '160 Patent recite and incorporate the improvements discussed above in specific, discrete implementations.

166.    For example, Claim 1 specifically incorporates the teaching discussed in ¶¶ 154-159. Claim 2 specifically incorporates the teaching discussed in ¶ 160. Claim 3 specifically incorporates the teaching discussed in ¶ 161. Claim 5 specifically incorporates the teaching discussed in ¶ 162. Claims 15 and 17 specifically incorporate the teachings discussed in ¶¶ 163 and 164, respectively.

167.    The teachings of the '160 Patent, especially as incorporated into the claims, represent technological solutions and combinations that were not available at the time of priority, as discussed by Michael T. Goodrich, Ph.D. in his declaration attached as **Exhibit 1**, which is incorporated by reference.

168.    Merely to provide examples, Dr. Goodrich opines:

(i)    This is a very specific solution to address the needs disclosed by the inventors. Moreover, the claims provide structure for how to solve the problem. For example, claim 1 recites "a memory operably coupled to the processor, wherein the memory encodes processor executable program instructions and data to program and configure the processor to cause the apparatus to perform operations comprising: receive an electronic message comprising a user payment for a bundled set of a plurality of selectively redeemable healthcare services to be provided by a plurality of respective providers, wherein the received payment is pre-paid in an amount of a bundle price based on a location at which at least one selectively redeemable healthcare service of the bundled set of healthcare services will be provided." Goodrich Decl. at ¶ 96.

(ii)    In short, the '160 Patent and in particular claims discussed in this opinion are directed to specific technological solutions that are rooted in computer technology, and these solutions are claimed specifically to overcome the problems the '160 Patent identifies which, again,

and as I describe above, are problems in the realm of computer technology. Goodrich Decl. at ¶ 98.

(iii)   Further, contrary to an abstract idea that simply involves collecting information, analyzing it, and displaying it, or a mathematical analysis that could be done with paper and pencil, claim 1 recites the generation of new data, including "generate an electronic health record comprising a purchase data record identified by and with a unique confirmation number." Goodrich Decl. at ¶ 99.

(iv)   In addition, in my opinion, the elements of the above-discussed claims are combined so as to claim an inventive concept. For example, the claims recite a combination of components in the claimed apparatuses that, on my experience in the field, was not routine and conventional as of the priority date of the '160 Patent. For instance, combining the components capable of the EHR with the usage of the claimed and taught electronic message contributed to the solution of the problem identified by the '160 Patent regarding prior art systems that the inventors have identified.  Goodrich Decl. at ¶ 101.

169.   The asserted claims of the '160 Patent do not preempt every solution – or even many solutions – for an improved virtual payment system. Instead, the asserted claims are very narrow to claim the specific improvements in computer technology – the technology that improved this computer process.

170.   The '160 Patent's asserted claims, as laid out above, do not simply instruct someone to apply an idea on a computer. The arrangement of the claim elements is not conventional.

171.   The inventions claimed by the '160 Patent represent a significant advance over the prior art.

172.   The examiner initially rejected claims of the '160 Patent on January 21, 2022 citing 35 U.S.C. §101. The claims, however, were amended and overcame the patent eligibility rejected and received a Notice of Allowance on March 16, 2022, noting that "the Applicant amended the claims to include language pertaining to the electronic message and electronic health record..."

173.   Moreover, the claims of the '160 Patent do not merely use well-understood, routine, or conventional techniques or systems.

174.    The claimed combinations also improve the operation of computer functionality, enabling the elements of the system to address the problems recognized in prior art systems as discussed in the Background of the Invention and the Summary of the Invention.

175.    The inventions claimed in the '160 Patent are not claiming a business method but, instead, claim a technical way to satisfy an existing technological problem for virtual payments related to bundled healthcare services.

176.    Each claim of the '160 Patent represents a separate invention, which is presumed to be valid under 35 U.S.C. §282.

177.    The claims of the '160 Patent are also presumed to be patent eligible under 35 U.S.C. §101.

178.    At all relevant times, MDSave has possessed and currently possesses a full and complete license to the '160 Patent from MDSave Shared Services.

**Defendant's Infringement of the '160 Patent**

179.    As shown in the '160 Patent preliminary claim charts, which are attached hereto as **Exhibit 9**, Sesame is infringing at least Claims 1-5, 9-11, 13-15, 17, 25, 27-28 of the '160 Patent through its products and services in the United States.

180.    Through this First Amended Complaint, MDSave Shared Services alleges direct infringement of the '160 Patent in violation of 35 U.S.C. § 271 against Sesame, as set forth below in the Fourth Claim for Relief.

**The '498 Patent**

181.    MDSave Shared Services owns United States Patent No. 11,475,498 (the "'498 Patent"), attached hereto as **Exhibit 10**.

182.    The '498 Patent and its claims are directed to a technological solution, including a specific architecture, related to prepaid bundled healthcare services with virtual payment distribution.

183.    For example, the Abstract of the '498 Patent states:

> Apparatus and associated methods relate to presenting for selection services comprising at least one bundled set of healthcare services to be performed separately by respective providers, determining a bundle price for the at least one bundled set of healthcare services, and in response to receiving payment in an amount of the bundle price, generating a purchase data record selectively redeemable to receive each of the at least one bundled set of healthcare services, and assigning a unique confirmation number generated for the purchase data record. One or more service of the bundled set may be a dental or veterinary service. The bundle price may be based on a location or time at which at least one service will be performed and may be determined using a user's remaining insurance deductible. Payment may be disbursed to multiple providers of the bundled set of healthcare services. A payment may be virtual funds.

184.    The '498 Patent identifies the need for a technological solution – specifically an apparatus for presenting to users a selection of at least one bundled set of healthcare services.

185.    With this in mind, the '498 Patent teaches computing apparatuses and architectures, to solve the problem, as identified in the following paragraphs.

186.    The '498 Patent teaches an apparatus with a processor and user interface, where the user interface is operably coupled with the processor. '498 Patent at 56:30-47.

187.    The '498 Patent teaches a memory being operably coupled to the processor where the memory is capable of encoding processor executable program instructions and data to program

and configure the processor to cause the apparatus to perform certain operations, which are described below. '498 Patent at 56:30-47.

188.    The '498 Patent teaches the aforementioned operations capable of including receiving an electronic message comprising, in part, a user payment for a bundled set of a plurality of selectively redeemable healthcare services. '498 Patent at 56:30-47.

189.    The '498 Patent teaches that, in response to receiving the electronic message, the capability of generating an electronic health record (EHR) comprising a purchase data record identified by and with a unique confirmation number. '498 Patent at 56:30-47.

190.    The '498 Patent teaches the capability of presetting an initial individual redemption status in the purchase data record for each selectively redeemable health care service as purchased and unredeemed. '498 Patent at 25:4-23.

191.    The '498 Patent teaches the capability of providing user access to the purchase data record to receive each selectively redeemable healthcare service of the plurality of healthcare services. '498 patent at 56:30-47.

192.    The '498 Patent teaches the apparatus where the processor, in response to receiving the electronic message comprising the user payment, has the capability to store the EHR in the memory and send the EHR to at least one provider of the plurality of respective providers. '498 Patent at 56:30-50.

193.    The '498 Patent teaches the apparatus with the capability of the operations comprising sending the unique confirmation number to the user. '498 Patent at 56:51-53.

194.    The '498 Patent teaches that the received payment has the capability of comprising virtual funds. '498 Patent at 51-59.

195.    The '498 Patent teaches the apparatus with the capability of the purchase data record persisting in a data store that is operably coupled with the processor and wherein the purchase data record is redeemable until each of the plurality of healthcare services in the bundled set is redeemed. '498 Patent at 57:20-24.

196.    The asserted claims of the '498 Patent recite and incorporate the improvements discussed above in specific, discrete implementations.

197.    For example, Claim 1 specifically incorporates the teaching discussed in ¶¶ 185-191 above. Claim 2 specifically incorporates the teaching discussed in ¶ 192. Claims 5 and 15 specifically incorporate the teachings discussed in ¶¶ 194 and 195, respectively.

198.    The teachings of the '498 Patent, especially as incorporated into the claims, represent technological solutions and combinations that were not available at the time of priority, as discussed by Michael T. Goodrich, Ph.D. in his declaration attached as **Exhibit 1**, which is incorporated by reference.

199.    Merely to provide examples, Dr. Goodrich opines:

(i)    This is a very specific solution to address the needs disclosed by the inventors. Moreover, the claims provide structure for how to solve the problem. For example, claim 1 recites "receive an electronic message comprising a user payment for a bundled set of a plurality of selectively redeemable healthcare services comprising at least one dental service to be provided by a plurality of respective providers, wherein the received payment is pre-paid in an amount of a bundle price based on a location at which at least one selectively redeemable healthcare service of the bundled set of healthcare services will be provided." Goodrich Decl. at ¶ 120.

(ii)    In short, the '498 Patent and in particular claims discussed in this opinion are directed to specific technological solutions that are rooted in computer technology, and these solutions are claimed specifically to overcome the problems the '498 Patent identifies which, again, and as I describe above, are problems in the realm of computer technology. Goodrich Decl. at ¶ 122.

(iii)    Further, contrary to an abstract idea that simply involves collecting information, analyzing it, and displaying it, or a mathematical analysis that could be done with paper and pencil, claim 1 recites the generation of new data, including "generate an electronic

health record comprising a purchase data record identified by and with a unique confirmation number." Goodrich Decl. at ¶ 123.

(iv)    For example, the claims recite a combination of components in the claimed apparatuses that, on my experience in the field, was not routine and conventional as of the priority date of the '498 Patent. For instance, combining the components capable of the EHR with the usage of the claimed and taught electronic message contributed to the solution of the problem identified by the '498 Patent regarding prior art systems that the inventors have identified.  Goodrich Decl. at ¶ 126.

200.    The asserted claims of the '498 Patent do not preempt every solution – or even many solutions – for an improved virtual payment system. Instead, the asserted claims are very narrow to claim the specific improvements in computer technology – the technology that improved this computer process.

201.    The '498 Patent's asserted claims, as laid out above, do not simply instruct someone to apply an idea on a computer. The arrangement of the claim elements is not conventional.

202.    The inventions claimed by the '498 Patent represent a significant advance over the prior art.

203.    The examiner initially rejected claims of the '498 Patent under 35 U.S.C. §§ 101 and 102. The applicant amended the claims and overcame the §§ 101 and 102 rejections, and a Notice of Allowance was received by the applicant on June 7, 2022.

204.    The Notice of Allowance stated, in part, that "the Applicant amended the claims to include: generate an electronic health record comprising a purchase data records identified by and with a unique confirmation number, present an initial individual redemption status in the purchase data record for each selectively redeemable healthcare service of the bundled set of healthcare services as purchased and unredeemed, and provide user access to the purchase data records to receive each selectively redeemable healthcare service of the plurality of healthcare [services]."

205.    Moreover, the claims of the '498 Patent do not merely use well-understood, routine, or conventional techniques or systems.

206.     The claimed combinations also improve the operation of computer functionality, enabling the elements of the system to address the problems recognized in prior art systems as discussed in the Background of the Invention and the Summary of the Invention.

207.     The inventions claimed in the '498 Patent are not claiming a business method but, instead, claim a technical way to satisfy an existing problem for virtual payments related to bundled healthcare services.

208.     Each claim of the '498 Patent represents a separate invention, which is presumed to be valid under 35 U.S.C. §282.

209.     The claims of the '498 Patent are also presumed to be patent eligible under 35 U.S.C. §101.

210.     At all relevant times, MDSave has possessed and currently possesses a full and complete license to the '498 Patent from MDSave Shared Services.

### Defendant's Infringement of the '498 Patent

211.     As shown in the '498 Patent preliminary claim charts, which are attached hereto as **Exhibit 11**, Sesame is infringing at least Claims 1-13, 15, 17-19, 21-23, 25 of the '498 Patent through its products and services in the United States.

212.     Through this First Amended Complaint, MDSave Shared Services alleges direct infringement of the '498 Patent in violation of 35 U.S.C. § 271 against Sesame, as set forth below in the Fifth Claim for Relief.

**The '276 Patent**

213.     MDSave Shared Services owns United States Patent No. 11,551,276 (the "'276 Patent"), attached hereto as **Exhibit 12**.

214.     The '276 Patent and its claims are directed to a technological solution, including a specific architecture, related to prepaid bundled healthcare services with virtual payment distribution.

215.     For example, the Abstract of the '276 Patent states:

> Apparatus and associated methods relate to presenting for selection, services comprising at least one bundled set of healthcare services to be performed separately by respective providers, determining a bundle price for the at least one bundled set of healthcare services and in response to receiving payment in an amount of the bundle price, generating a persistent purchase data record with a unique confirmation number that is selectively redeemable by the user to receive each of the healthcare services in the bundled set. The bundle price may be discounted and/or based on the location or time at which at least one service will be performed. The bundle price may also be based on the user's remaining health insurance deductible. A single payment may be disbursed to multiple providers of the bundled set of healthcare services. The received and/or disbursed payment may be in virtual funds.

216.     The '276 Patent identifies the need for a technological solution – specifically techniques and methods for presenting to users a selection of at least one bundled set of healthcare services.

217.     With this in mind, the '276 Patent teaches computing systems, architectures, and methods to solve the problem, as identified in the following paragraphs.

218.     The '276 Patent teaches receiving an electronic message that comprises a selection of at least one bundled set of a plurality of selectively redeemable healthcare services to be provided by a plurality of respective providers, wherein a processor is utilized. '276 Patent at 48:42-61; 49:14-30.

219.    The '276 Patent teaches that in response to the electronic message comprising the selection, generating an electronic health records for the selection identified by and with a unique confirmation using the processor. '276 Patent at 56:43-61.

220.    The '276 Patent teaches using the processor to preset an initial individual redemption status in the purchase data record for each selectively redeemable healthcare service of the at least one bundled set of healthcare services as unredeemed. '276 Patent at 24:63-25:15.

221.    The '276 Patent teaches providing via the processor a user access to the purchase data record to receive each selectively redeemable healthcare service of the plurality of healthcare services of the at least one bundled set. '276 Patent at 55:44:59.

222.    The '276 Patent teaches receiving the electronic message comprising payment in an amount of the bundle price for each of the at least one bundled set of healthcare services, using the processor. '276 Patent 56:27-64.

223.    The '276 Patent teaches that in response to receiving the electronic message comprising the payment, using the processor to store the electronic health record in a memory configured to be operably coupled with the processor and using the processor to send the electronic health record to at least one provider. '276 Patent at 24:34-25:50.

224.    The '276 Patent teaches the memory being operably coupled to the processor, wherein the memory comprises encoded processor executable instructions and data, where said instructions and data jointly program and configure the processor and where the instructions, when executed by the processor, cause the processor to perform the operations. '276 Patent at 55:44-59.

225.    The '276 Patent teaches that the purchase data record persists in a data store operably coupled with the processor and where the purchase data record is redeemable using the

40

processor until each of the plurality of healthcare services in the bundled set is redeemed. '276 Patent at 56:12-37.

226.    The asserted claims of the '276 Patent recite and incorporate the improvements discussed above in specific, discrete implementations.

227.    For example, Claim 1 specifically incorporates the teaching discussed in ¶¶ 217-221 above. Claim 2 specifically incorporates the teaching discussed in ¶ 222. Claims 7, 8, and 9 specifically incorporate the teachings discussed in ¶¶ 223, 224, and 225, respectively.

228.    The teachings of the '276 Patent, especially as incorporated into the claims, represent technological solutions and combinations that were not available at the time of priority, as discussed by Michael T. Goodrich, Ph.D. in his declaration attached as **Exhibit 1**, which is incorporated by reference.

229.    Merely to provide examples, Dr. Goodrich opines:

(i)    This is a very specific solution to address the needs disclosed by the inventors. Moreover, the claims provide structure for how to solve the problem. For example, claim 1 recites "receiving, an electronic message comprising a selection of at least one bundled set of a plurality of selectively redeemable healthcare services to be provided by a plurality of respective providers, using a processor, wherein the received selection is associated with a bundle price based on a location at which at least one selectively redeemable healthcare service of the bundled set of healthcare services will be provided." Goodrich Decl. at ¶ 143.

(ii)    Further, contrary to an abstract idea that simply involves collecting information, analyzing it, and displaying it, or a mathematical analysis that could be done with paper and pencil, claim 1 recites the generation of new data, including "generating, an electronic health record comprising a purchase data record for the selection identified by and with a unique confirmation number using the processor" Goodrich Decl. at ¶ 146.

(iii)    For example, the claims recite a combination of components and functionalities and method steps in the claimed methods that, on my experience in the field, was not routine and conventional as of the priority date of the '276 Patent. For instance, combining the components capable of the EHR with the usage of the claimed and taught electronic message contributed to the solution of the problem identified by the '276 Patent regarding prior art systems that the inventors have identified.  Goodrich Decl. at ¶ 149.

230.    The asserted claims of the '276 Patent do not preempt every solution – or even many solutions – for an improved virtual payment method. Instead, the asserted claims are very narrow to claim the specific improvements in computer technology – the technology that improved this computer process.

231.    The '276 Patent's asserted claims, as laid out above, do not simply instruct someone to apply an idea on a computer. The arrangement of the claim elements is not conventional.

232.    The inventions claimed by the '276 Patent represent a significant advance over the prior art.

233.    The examiner issued a Notice of Allowance on November 15, 2022. The Notice of Allowance stated, in part: "The prior art does not disclose: presetting, an initial individual redemption status in the purchase data record for each selectively redeemable healthcare service of the at least one bundled set of healthcare services as unredeemed using the processor, and providing, a user access to the purchase data record to receive each selectively redeemable healthcare service of the plurality of healthcare services of the at least one bundled set, using the processor. . ."

234.    Moreover, the claims of the '276 Patent do not merely use well-understood, routine, or conventional techniques or systems.

235.    The claimed combinations also improve the operation of computer functionality, enabling the elements of the system to address the problems recognized in prior art systems as discussed in the Background of the Invention and the Summary of the Invention.

236.    The inventions claimed in the '276 Patent are not claiming a business method but, instead, claim a technical way to satisfy an existing problem for virtual payments related to bundled healthcare services.

237.    Each claim of the '276 Patent represents a separate invention, which is presumed to be valid under 35 U.S.C. §282.

238.    The claims of the '276 Patent are also presumed to be patent eligible under 35 U.S.C. §101.

239.    At all relevant times, MDSave has possessed and currently possesses a full and complete license to the '276 Patent from MDSave Shared Services.

### Defendant's Infringement of the '276 Patent

240.    As shown in the '276 Patent preliminary claim charts, which are attached hereto as **Exhibit 13**, Sesame is infringing at least Claims 1, 2, 7-10, 19-24, 26, 29, and 30 of the '276 Patent through its products and services in the United States.

241.    Through this First Amended Complaint, MDSave Shared Services alleges direct infringement of the '276 Patent in violation of 35 U.S.C. § 271 against Sesame, as set forth below in the Sixth Claim for Relief.

### The '021 Patent

242.    MDSave Shared Services owns United States Patent No. 10,991,021 (the "'021 Patent"), attached hereto as **Exhibit 14**.

243.    The '021 Patent and its claims are directed to a technological solution, including a specific architecture, used to facilitate procurement of healthcare services or medical resources triggered by a lifecycle event.

244.    For example, the Abstract of the '021 Patent states:

Apparatus and associated methods related to determining medical services appropriate to a patient in response to a patient lifecycle event: presenting the medical services to the patient for selection; optionally scheduling the selected medical services; and automatically presenting the selected services for prepayment. The patient lifecycle event may be, for example, a doctor's order, diagnosis, condition change, payment, admission, or discharge. The services

presented to the patient may be determined in response to, and as a function of, the lifecycle event. For example, the services presented may include procedures determined after the lifecycle event, in view of patient medical history. In an illustrative example, the services presented may be based on medical indication, contraindication, provider or facility availability, or patient scheduling preference, advantageously permitting more medically relevant, beneficial, convenient, or cost-effective services. Various examples may advantageously provide a discount for a service bundle provided at a particular time or facility or by an affiliated physician or medical group.

245.    The '021 Patent identifies the need for a technological solution – specifically a technological solution where an improved computer architecture and apparatus determines medical services appropriate to a patient in response to a patient lifecycle event. '021 Patent at 2:40-60; 8:49-62.

246.    With this in mind, the '021 Patent teaches computing architectures and apparatuses to solve the problems, as identified in the following paragraphs.

247.    The '021 Patent teaches an apparatus that comprises a processor and a user interface that is operably coupled to the processor. '021 Patent at 3:45-65.

248.    The '021 Patent teaches that the memory, which is operably coupled to the processor, is capable of encoding processor executable program instructions and data to program and configure the processor to cause the apparatus to perform certain functions, described below. '021 Patent at 3:45-65.

249.    The '021 Patent teaches these operations are capable of including receiving an electronic message comprising an electronic health record (EHR) encoding updated patient medical data. '021 Patent at 53:14-60:16.

250.    The '021 Patent teaches the operations are capable of including determining the current patient lifecycle state based on the EHR. '021 Patent at 4:25-53.

251. The '021 Patent teaches the operations are capable of including determining if a patient lifecycle event occurred based on comparing a historical patient lifecycle state with the current patent lifecycle state. '021 Patent at 4:25-53.

252. The '021 Patent teaches the operations are capable of including in response to determining a patient's lifecycle event occurred, determining medical services to be offered to the patent, wherein the medical services are not contraindicated for the patient based on the lifecycle event and the patient medical history determined as a function of the EHR. '021 Patent at 3:1-12.

253. The '021 Patent teaches the operations are capable of including in response to determining a patient's lifecycle event occurred, presenting the medical services to be offered to the patient in the user interface for selection as a function of available service location and available service time. '021 Patent at 3:46-4:3.

254. The '021 Patent teaches the operations to include automatically present the selected services to the patient in the user interface for prepayment. '021 Patent at 3:25-34.

255. The '021 Patent teaches the apparatus described above wherein the medical services appropriate to the patient further comprise the capability of a medical service determined as a function of the patient lifecycle event. '021 Patent at 4:4-22.

256. The asserted claims of the '021 Patent recite and incorporate the improvements discussed above in specific, discrete implementations.

257. For example, Claim 1 specifically incorporates the teaching discussed in ¶¶ 246-254 above.

258. The teachings of the '021 Patent, especially as incorporated into the claims, represent technological solutions and combinations that were not available at the time of priority,

as discussed by Michael T. Goodrich, Ph.D. in his declaration attached as **Exhibit 1**, which is incorporated by reference.

259.     Merely to provide examples, Dr. Goodrich opines:

(i)     This is a very specific solution to address the needs disclosed by the inventors. Moreover, the claims provide structure for how to solve the problem. For example, claim 1 recites "a memory, operably coupled with the processor, wherein the memory encodes processor executable program instructions and data to program and configure the processor to cause the apparatus to perform operations comprising: receive an electronic message comprising an EHR (Electronic Health Record) encoding updated patient medical data; determine the current patient lifecycle state based on the EHR; determine if a patient lifecycle event occurred, based on comparing a historical patient lifecycle state with the current patient lifecycle state." Goodrich Decl. at ¶ 164.

(ii)     Further, contrary to an abstract idea that simply involves collecting information, analyzing it, and displaying it, or a mathematical analysis that could be done with paper and pencil, claim 1 recites the generation of new data, including "determine medical services to be offered to the patient, wherein the medical services are not contraindicated for the patient based on the lifecycle event and the patient medical history determined as a function of the EHR." Goodrich Decl. at ¶ 167.

(iii)     For example, the claims recite a combination of components in the claimed apparatuses that, on my experience in the field, was not routine and conventional as of the priority date of the '021 Patent. For instance, combining the components capable of the EHR with the usage of the claimed and taught electronic message contributed to the solution of the problem identified by the '021 Patent regarding prior art systems that the inventors have identified.  Goodrich Decl. at ¶ 170.

260.     The asserted claims of the '021 Patent do not preempt every technological solution – or even many solutions – for determining medical services appropriate to a patient in response to a patient lifecycle event. Instead, the asserted claims are very narrow to claim the specific improvements in computer technology – the technology that improved this computer process.

261.     The '021 Patent's asserted claims, as laid out above, do not simply instruct someone to apply an idea on a computer. The arrangement of the claim elements is not conventional.

262.     The inventions claimed by the '021 Patent represent a significant advance over the prior art.

263.     The examiner initially rejected claims of the '021 Patent under 35 U.S.C. §§ 101 and 103.

264.     The claims were amended, and a Notice of Allowance was received on February 9, 2021.

265.     Moreover, the claims of the '021 Patent do not merely use well-understood, routine, or conventional techniques or systems.

266.     The claimed combinations also improve the operation of computer functionality, enabling the elements of the system to address the problems recognized in prior art systems as discussed in the Background of the Invention and the Summary of the Invention.

267.     The inventions claimed in the '021 Patent are not claiming a business method but, instead, claim a technical way to satisfy an existing problem for as described by the '021 Patent through certain specific arrangements of features that improve a technological process.

268.     Each claim of the '021 Patent represents a separate invention, which is presumed to be valid under 35 U.S.C. §282.

269.     The claims of the '021 Patent are also presumed to be patent eligible under 35 U.S.C. §101.

270.     At all relevant times, MDSave has possessed and currently possesses a full and complete license to the '021 Patent from MDSave Shared Services.

**Defendant's Infringement of the '021 Patent**

271.     As shown in the '021 Patent preliminary claim charts, which are attached hereto as **Exhibit 15**, Sesame is infringing at least Claims 1-5, 6, and 9 of the '021 Patent through its products and services in the United States.

272.     Through this First Amended Complaint, MDSave Shared Services alleges direct infringement of the '021 Patent in violation of 35 U.S.C. § 271 against Sesame, as set forth below in the Seventh Claim for Relief.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Direct Infringement of the '072 Patent

273.     MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

274.     As set forth in **Exhibit 3**, Sesame is infringing, and has infringed, the '072 Patent either literally or under the doctrine of equivalents by performing each and every step set forth in at least Claims 1-4, 12-15, 16, and 24-26 of the '072 Patent in violation of 35 U.S.C. § 271.

275.     Upon information and belief, Sesame has actual and constructive knowledge of the '072 Patent, including because the patent is listed on MDSave's website, which Sesame studied, and copied.

276.     Moreover, Sesame has knowledge Plaintiffs' patents and of Sesame's infringement based on the complaint and claim charts filed and served in *MDSave Inc. v. Sesame, Inc.*, C.A. No. 6:21-1338-ADA (W.D. Tex.) (D.I. 1 & 4).

277.     MDSave Shared Services has been damaged by Sesame's infringement.

278.     Sesame's conduct has been willful and intentional.

279.     Sesame studied, and copied MDSave's website, which lists the '072 Patent, and Sesame was aware of the '072 Patent and its infringement as a result of the Texas litigation. Sesame therefore had knowledge of, or was willfully blind to, the existence of the '072 Patent and its infringement thereof.

280.    Sesame's conduct has caused and is causing irreparable injury to MDSave Shared Services and, unless enjoined by this Court, will continue to do so.

### SECOND CLAIM FOR RELIEF
### Direct Infringement of the '423 Patent

281.    MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

282.    As set forth in **Exhibit 5**, Sesame is infringing, and has infringed, the '423 Patent either literally or under the doctrine of equivalents by performing each and every step set forth in at least Claim 1 of the '423 Patent in violation of 35 U.S.C. § 271.

283.    Upon information and belief, Sesame has actual and constructive knowledge of the '423 Patent, including because the patent is listed on MDSave's website, which Sesame studied, and copied.

284.    Moreover, Sesame has knowledge of Plaintiffs' patents and of Sesame's infringement based on the complaint and claim charts filed and served in *MDSave Inc. v. Sesame, Inc.*, C.A. No. 6:21-1338-ADA (W.D. Tex.) (D.I. 1 & 4).

285.    MDSave Shared Services has been damaged by Sesame's infringement.

286.    Sesame's conduct has been willful and intentional. Sesame studied, and copied MDSave's website, which lists the '423 Patent, and Sesame was aware of the '423 Patent and its infringement as a result of the Texas litigation. Sesame therefore had knowledge of, or was willfully blind to, the existence of the '423 Patent and its infringement thereof.

287.    Sesame's conduct has caused and is causing irreparable injury to MDSave Shared Services and, unless enjoined by this Court, will continue to do so.

## THIRD CLAIM FOR RELIEF
### Direct Infringement of the '115 Patent

288.     MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

289.     As set forth in **Exhibit 7**, Sesame is infringing, and has infringed, the '115 Patent either literally or under the doctrine of equivalents by performing each and every step set forth in at least Claims 1-5, 9-11, 13-15, 17, 25, and 27-28 of the '115 Patent in violation of 35 U.S.C. § 271.

290.     Upon information and belief, Sesame has actual and constructive knowledge of the '115 Patent, including because the patent is listed on MDSave's website, which Sesame studied, and copied.

291.     Moreover, Sesame has knowledge Plaintiffs' patents and of Sesame's infringement based on the complaint and claim charts filed and served in *MDSave Inc. v. Sesame, Inc.*, C.A. No. 6:21-1338-ADA (W.D. Tex.) (D.I. 1 & 4).

292.     MDSave Shared Services has been damaged by Sesame's infringement.

293.     Sesame's conduct has been willful and intentional.

294.     Sesame studied, and copied MDSave's website, which lists the '115 Patent, and Sesame was aware of the '115 Patent and its infringement as a result of the Texas litigation. Sesame therefore had knowledge of, or was willfully blind to, the existence of the '115 Patent and its infringement thereof.

295.     Sesame's conduct has caused and is causing irreparable injury to MDSave Shared Services and, unless enjoined by this Court, will continue to do so.

## FOURTH CLAIM FOR RELIEF
### Direct Infringement of the '160 Patent

296.    MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

297.    As set forth in **Exhibit 9**, Sesame is infringing, and has infringed, the '160 Patent either literally or under the doctrine of equivalents by performing each and every step set forth in at least Claims 1-5, 9-11, 13-15, 17, 25, and 27-28 of the '160 Patent in violation of 35 U.S.C. § 271.

298.    Upon information and belief, Sesame has actual and constructive knowledge of the '160 Patent, including because the patent is listed on MDSave's website, which Sesame studied, and copied.

299.    Moreover, Sesame has knowledge Plaintiffs' patents and of Sesame's infringement based on the complaint and claim charts filed and served in *MDSave Inc. v. Sesame, Inc.*, C.A. No. 6:21-1338-ADA (W.D. Tex.) (D.I. 1 & 4).

300.    MDSave Shared Services has been damaged by Sesame's infringement.

301.    Sesame's conduct has been willful and intentional.

302.    Sesame studied, and copied MDSave's website, which lists the '160 Patent, and Sesame was aware of the '160 Patent and its infringement as a result of the Texas litigation. Sesame therefore had knowledge of, or was willfully blind to, the existence of the '160 Patent and its infringement thereof.

303.    Sesame's conduct has caused and is causing irreparable injury to MDSave Shared Services and, unless enjoined by this Court, will continue to do so.

## FIFTH CLAIM FOR RELIEF
### Direct Infringement of the '498 Patent

304.     MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

305.     As set forth in **Exhibit 11**, Sesame is infringing, and has infringed, the '498 Patent either literally or under the doctrine of equivalents by performing each and every step set forth in at least Claims 1-13, 15, 17-19, 21-23, and 25 of the '498 Patent in violation of 35 U.S.C. § 271.

306.     Upon information and belief, Sesame has actual and constructive knowledge of the '498 Patent, including because the patent is listed on MDSave's website, which Sesame studied, and copied.

307.     Moreover, Sesame has knowledge Plaintiffs' patents and of Sesame's infringement based on the complaint and claim charts filed and served in *MDSave Inc. v. Sesame, Inc.*, C.A. No. 6:21-1338-ADA (W.D. Tex.) (D.I. 1 & 4).

308.     MDSave Shared Services has been damaged by Sesame's infringement.

309.     Sesame's conduct has been willful and intentional.

310.     Sesame studied, and copied MDSave's website, which lists the '498 Patent, and Sesame was aware of the '498 Patent and its infringement as a result of the Texas litigation. Sesame therefore had knowledge of, or was willfully blind to, the existence of the '498 Patent and its infringement thereof.

311.     Sesame's conduct has caused and is causing irreparable injury to MDSave Shared Services and, unless enjoined by this Court, will continue to do so.

## SIXTH CLAIM FOR RELIEF
### Direct Infringement of the '276 Patent

312.    MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

313.    As set forth in **Exhibit 13**, Sesame is infringing, and has infringed, the '276 Patent either literally or under the doctrine of equivalents by performing each and every step set forth in at least Claims 1, 2, 7-10, 19-24, 26, 29, and 30 of the '276 Patent in violation of 35 U.S.C. § 271.

314.    Upon information and belief, Sesame has actual and constructive knowledge of the '276 Patent, including because the patent is listed on MDSave's website, which Sesame studied, and copied.

315.    Moreover, Sesame has knowledge Plaintiffs' patents and of Sesame's infringement based on the complaint and claim charts filed and served in *MDSave Inc. v. Sesame, Inc.*, C.A. No. 6:21-1338-ADA (W.D. Tex.) (D.I. 1 & 4).

316.    MDSave Shared Services has been damaged by Sesame's infringement.

317.    Sesame's conduct has been willful and intentional.

318.    Sesame studied, and copied MDSave's website, which lists the '276 Patent, and Sesame was aware of the '276 Patent and its infringement as a result of the Texas litigation. Sesame therefore had knowledge of, or was willfully blind to, the existence of the '276 Patent and its infringement thereof.

319.    Sesame's conduct has caused and is causing irreparable injury to MDSave Shared Services and, unless enjoined by this Court, will continue to do so.

## SEVENTH CLAIM FOR RELIEF
### Direct Infringement of the '021 Patent

320.    MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

321.    As set forth in **Exhibit 15**, Sesame is infringing, and has infringed, the '021 Patent either literally or under the doctrine of equivalents by performing each and every step set forth in at least Claims 1-6, and 9 of the '021 Patent in violation of 35 U.S.C. § 271.

322.    Upon information and belief, Sesame has actual and constructive knowledge of the '021 Patent, including because the patent is listed on MDSave's website, which Sesame studied, and copied.

323.    Moreover, Sesame has knowledge Plaintiffs' patents and of Sesame's infringement based on the complaint and claim charts filed and served in *MDSave Inc. v. Sesame, Inc.*, C.A. No. 6:21-1338-ADA (W.D. Tex.) (D.I. 1 & 4).

324.    MDSave Shared Services has been damaged by Sesame's infringement.

325.    Sesame's conduct has been willful and intentional.

326.    Sesame studied, and copied MDSave's website, which lists the '021 Patent, and Sesame was aware of the '021 Patent and its infringement as a result of the Texas litigation. Sesame therefore had knowledge of, or was willfully blind to, the existence of the '021 Patent and its infringement thereof.

327.    Sesame's conduct has caused and is causing irreparable injury to MDSave Shared Services and, unless enjoined by this Court, will continue to do so.

## EIGHTH CLAIM FOR RELIEF
### Tortious Interference with Prospective Business Relationships

328.    MDSave Shared Services realleges and incorporates by reference each and every paragraph of this First Amended Complaint as if fully set forth herein and further alleges as follows:

329.    Sesame stated on its website that it maintained relationships with the healthcare providers for whom it was selling vouchers or healthcare services. Upon information and belief, Sesame did not have    pre-existing relationships with those providers and was only listing procedures and services by these providers because it had used MDSave's data in a way that violated MDSave's Terms & Conditions.

330.    Indeed, upon information and belief, once Sesame "sold" a healthcare procedure based on its misrepresentation that it had a pre-existing relationship with healthcare providers, Sesame would then have to attempt to try to secure a "voucher" or healthcare service for the price that it claimed it had pre-arranged with those healthcare providers.

331.    There can be no question these false statements deceived the public, including MDSave's potential customers. Upon information and belief, customers purchased healthcare procedures from Sesame based on the representation that it had pre-arranged with healthcare providers for specific services at specific rates, and that those providers had been vetted and approved. Upon information and belief, if customers understood that Sesame's representations regarding their available bundled healthcare procedures were only aspirational (and indeed, based off of using MDSave's data in a way that violated MDSave's Terms & Conditions), then they would not have made the purchases.

332.    Sesame acted with the conscious desire to prevent MDSave, its competitor, from forming relationships with customers and healthcare partners, or knew the interference was certain

or substantially certain to occur as a result of its unlawful conduct. Upon information and belief, Sesame alone, and in concert with third parties, exploited MDSave's protectable data in violation of MDSave's Terms & Conditions to interfere with MDSave's prospective business relationships by reaching separate agreements with MDSave healthcare partners and customers, which had the result of harming MDSave through loss of customers and impairment to its relationships with healthcare partners.

333.   There was a reasonable probability that MDSave would have sold vouchers or healthcare services to customers and/or entered into paid contractual agreements with healthcare providers but for Sesame's tortious interference.

334.   Sesame's interference with MDSave's prospective economic interests proximately caused MDSave injury, in that Sesame has sold vouchers or healthcare services based on MDSave's data to customers who otherwise would have purchased vouchers or healthcare services from MDSave, and in that the market confusion created by Sesame's conduct has substantially impaired MDSave's efforts to partner with hospitals and healthcare providers.

335.   In addition, Sesame tortiously interfered with the prospective economic relationship between MDSave and outside investors. On information and belief, both MDSave and Sesame were seeking capital from the same potential investors. On information and belief, Sesame made false and misleading representations to those potential investor(s), such as stating that Sesame had a network of providers that included the providers that Sesame illegally derived from MDSave's website. Representations such as those, on information and belief, allowed Sesame to secure funding, investment, and support that it would not otherwise have received. On information and believe, had this not occurred, MDSave would have secured additional funding, investment and support, including from third parties who did in fact invest with Sesame in 2021.

336.    Sesame's interference and the concomitant loss of customers and partner providers have caused and will continue to cause MDSave injury, through reduced revenue and market share and lost investment opportunities.

337.    Sesame's conduct has caused and is causing irreparable injury to MDSave and, unless enjoined by this Court, will continue to do so.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court enter judgment in its favor on each and every claim for relief set forth above and award Plaintiffs relief, including, but not limited to, an Order:

338.    Declaring that Sesame has infringed and is continuing to infringe one or more claims of the '072, '423, '115, '160, '498, '276, and '021 Patents;

339.    Preliminarily and permanently enjoining Sesame, its officers, employees, agents, subsidiaries, representatives, distributors, dealers, members, affiliates, licensees, internet service providers, and all persons acting in concert or participation with them from directly or indirectly infringing one or more claims of the '072, '423, '115, '160, '498, '276, and '021 Patents and otherwise tortuously interfering with MDSave's prospective business relationships with customers, investors, and healthcare provider partners;

340.    Awarding Plaintiffs damages adequate to compensate for Sesame's actions, including supplemental damages for any post-verdict infringement up until entry of final judgment with an accounting as needed, together with pre-judgment and post-judgment interest on the damages awarded;

341.    Declaring that Sesame's infringement has been willful and awarding Plaintiffs enhanced damages under 35 U.S.C. § 284;

342.    Declaring that this case is exceptional and awarding Plaintiffs its costs and attorneys' fees in this action pursuant to 35 U.S.C. § 285, or as otherwise provided by law; and awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 7, 2023

Respectfully Submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

R. David Donoghue *(Pro Hac Vice)*
Anthony J. Fuga *(Pro Hac Vice)*
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Kelly J. Hollowell *(Pro Hac Vice)*
HOLLOWELL PATENT GROUP LLC
780 Lynnhaven Parkway, Suite 400
Virginia Beach, VA 23452
kelly@hpgww.com

*Attorneys for the Plaintiffs,*
*MDSave Shared Services, Inc. and MDSave, Inc.*